FISCHER ARTIFICIAL ICE & COLD STORAGE COMPANY, a corporation, appellant, v. IOWA STATE TAX COMMISSION, appellee.

No. 49068.

(Reported in 81 N.W.2d 437)

MARCH 5, 1957.

O'Connor, Thomas, McDermott & Wright, of Dubuque, for appellant.

Norman A. Erbe, Attorney General, and M. A. Iverson, Special Assistant Attorney General, for appellee.

GARFIELD, J.—The question presented to us is whether plaintiff's purchase and use of electricity for "sharp freezing" and cold storage of meat and other foodstuffs are exempt from Iowa sales and use tax under chapters 422, 423, Code, 1954. Exemp-

tion is claimed on the ground the electricity was "purchased and used in the processing of tangible personal property intended to be sold ultimately at retail" within the meaning of Code section 422.42(3).

It is not clear whether the tax was assessed under chapter 422 upon the sale of the electricity or under chapter 423 upon its use. Defendant, Iowa State Tax Commission, says it does not contend that if the tax was upon the use plaintiff must show, to be entitled to exemption, the electricity was intended to "become an integral part of other tangible personal property intended to be sold ultimately at retail," as provided in section 423.1(1). In other words defendant expressly waives any "integral part" test of the exemption claimed. Defendant admits the exemption provided by section 422.42(3) quoted above is for all practical purposes identical with that contemplated by section 423.1(1) and (4) except for the "integral part" requirement of 423.1(1) which has been waived here.

█ It therefore seems immaterial whether the tax was assessed or the exemption is claimed under chapter 422 or 423. Since it is admitted the foodstuffs were "intended to be sold ultimately at retail" the right to exemption depends on whether the electricity was purchased and used in processing them. The district court denied the exemption. As the parties concede and Code section 422.55 seems to contemplate, our review is de novo under rule 334, Rules of Civil Procedure.

█ It is true, as defendant says, tax-exemption statutes are strictly construed and one claiming an exemption must show his right thereto by evidence which leaves the question free from doubt. Cornell College v. Board of Review of Tama County, 248 Iowa 388, 390, 81 N.W.2d 25, 26, and citations; Peoples Gas & Elec. Co. v. State Tax Comm., 238 Iowa 1369, 1373-5, 28 N.W.2d 799, 803, and citations.

However there is no dispute in the evidence. Three witnesses testified for plaintiff. Although defendant cross-examined them it called no witnesses. The matter of strict construction is not so important here as in some cases where a tax exemption is claimed. In this respect the case is like Bruce Motor Freight v. Lauterbach, 247 Iowa 956, 971, 77 N.W.2d 613, 621, 622,

and City of Ames v. State Tax Comm., 246 Iowa 1016, 1026, 71 N.W.2d 15, 21.

Plaintiff manufactures ice and operates a freezing and cold storage business in Dubuque. It purchases its electricity from Interstate Power Company. The electricity used in manufacturing ice is admittedly exempt from sales or use tax. The electricity used to freeze and store foods in lockers is admittedly subject to the tax since it is not intended these foods are to be sold ultimately at retail—they have already been sold to the consumer before they come into plaintiff's possession. The controversy is over taxability of electricity used in what plaintiff claims is processing meat, butter, eggs and cheese received mainly from packing houses or other wholesalers or distributors.

Plaintiff receives the meat fresh and unfrozen usually at a temperature of 45 to 50 degrees. (All temperatures referred to are Fahrenheit.) It "hard freezes" the meat in freezer rooms where temperature is zero to 20 degrees below zero. This takes six to eight days. The method plaintiff employs to freeze meat does not differ from that used by Dubuque Packing Company and Rath Packing Company, two of plaintiff's customers. The cold temperatures herein mentioned are generated by the direct expansion method, using liquid ammonia under pressure, compressed by electrically driven motors, and sent through coils or pipes in the freezer rooms.

Plaintiff receives the butter in bulk form in cardboard boxes weighing 60 to 64 pounds, at a temperature of about 50 degrees. It freezes the butter in freezer rooms where the temperature is zero to five degrees below zero. This takes 10 to 12 days. Butter remains in the plant six months to a year. Before delivery to its customers butter is brought from the freezer rooms into warmer temperature of about 50 degrees to facilitate further processing by the customers.

Plaintiff receives fresh whole eggs at an average temperature of 50 degrees. They are kept six to ten days in a cooler with temperature of 32 to 34 degrees. The eggs are then moved from the cooler into a somewhat warmer room so they may be removed from the shells and the whites and yolks readily separated—the whites harden or "set up." The owner of the eggs, not plaintiff, then breaks and powders them, runs them through

a churn, adds various formulae and places them in cans holding 30 pounds. The cans at a temperature of 50 degrees are then placed in plaintiff's "sharp freeze" room where it is 20 to 30 degrees below zero for three to five days. They are then kept frozen six weeks in temperature from zero to 15 degrees below zero before shipment. A chemical reaction goes on in the eggs during this period which thickens them or brings about gelation and changes their flavor.

Plaintiff receives in 70-pound tubs cheese, mostly Cheddar, in the "green" stage, not fit for human consumption, and places it in a cooler room with temperature between 30 and 40 degrees for about a year. When outdoor temperature is below that plaintiff maintains for cheese it uses an electric heater to raise the temperature to the required level. By the end of this year a mold forms on the cheese, a result that is desired. At the end of the period the cheese is edible.

The head of the chemistry department at Loras College testified "processing" has a readily acceptable meaning in the field of chemistry and he would think of it as involving some form of treatment applied to material for a purpose. In answer to hypothetical questions based on the evidence of plaintiff's handling of the meat, butter, eggs and cheese, the witness expressed the opinion it constituted processing of these products.

Neither chapter 422 nor 423 defines processing. It seems clear the term should be given its usual, ordinary and commonly understood meaning or, as Code section 4.1(2) requires, the meaning that accords with "the approved usage of the language." See Borden v. World War II Serv. Comp. Bd., 243 Iowa 892, 903, 904, 54 N.W.2d 496, 503, and citations; Daily Record Co. v. Armel, 243 Iowa 913, 917, 918, 54 N.W.2d 503, 506, and citations; 82 C. J. S., Statutes, section 329b, page 639; 50 Am. Jur., Statutes, section 238.

One of the most widely cited precedents on the meaning of processing is Kennedy v. State Board of Assessment and Review, 224 Iowa 405, 407, 408, 276 N.W. 205, 206. The case holds the use of fertilizer in the ground to promote the growth of vegetables is not processing of tangible personal property—the growing of crops is not processing. The opinion quotes the

definition of processing in Webster's International Dictionary, Second Ed., 1934, as follows: " 'To subject to some special process or treatment. To subject (esp. raw material) to a process of manufacture, development, preparation for the market, etc.; to convert into marketable form, as livestock for slaughtering, grain for milling, cotton for spinning, milk by pasteurizing, fruits and vegetables by sorting and repacking.'

"The same Dictionary defines a processor as follows: 'One who or that which processes; specif., one who is in the business of converting any agricultural commodity into a marketable form.' "

The Kennedy opinion also refers to processing as " 'a change in the form of the article itself by artificial or natural means' " and as " 'some change made in the natural product as the curing of meats, canning of vegetables and * * * the glazing of an eggshell to better preserve the egg * * *.' "

Rule 25.2 of defendant, tax commission, entitled "Electricity used in processing—when exempt", incorporates the definition of processing found in Webster's New International Dictionary. It includes that quoted above in our Kennedy opinion (from which defendant says it took this part of the rule) and some in addition. Following the initial clause, "To subject to some special process or treatment" there appears: "Specif. A. To heat, as fruit, with steam under pressure, so as to cook or sterilize."

The commission's rule 26 contains a partial list, as an illustrative guide, of activities that are considered processing. It includes pasteurizing milk, cooking food and keeping it warm until served and purification of water. The rule says refrigeration, ventilation and air conditioning are not regarded as processing. It has been pointed out the essential part of Webster's definition of processing is in substance to prepare raw material for the market. Moore v. Farmers Mutual Mfg. & Ginning Co., 51 Ariz. 378, 77 P.2d 209, 211, 212; Michigan Allied Dairy Assn. v. Auditor General, 302 Mich. 643, 5 N.W.2d 516, 517; Bay Bottled Gas Co. v. Michigan Dept. of Revenue, 344 Mich. 326, 74 N.W.2d 37, 39. The Michigan Allied Dairy case holds the pasteurization and subsequent refrigeration of milk, thereby protecting it against contamination and rendering

it marketable, is processing, and the use of cans and bottles in the course of the operation is exempt from tax. A like decision as to electricity used in pasteurizing is Reeves v. Fenley's Model Dairy, Inc., 314 Ky. 380, 235 S.W.2d 995, 997.

Huron Fish Co. v. Glander, 146 Ohio St. 631, 634, 67 N.E.2d 546, 548, quotes this part of the Oxford English Dictionary definition of the verb "process": " 'To subject to or treat by a special process * * *; * * * to prepare by an artificial or special process; to preserve fruit, fish, flesh, etc., by some process.' "

A widely quoted definition of "process" is this from Cochrane v. Deener, 94 U. S. 780, 788, 24 L. Ed. 139, 141: "a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing."

■ In the light of these definitions we think it clear from the undisputed evidence plaintiff is engaged in processing meat, butter, eggs and cheese and the electricity purchased and used in so doing is exempt from sales and use tax. It is plain these products are subjected to special treatment in preparation for the market. The foodstuffs other than cheese are transformed from their fresh, natural state into a hard-frozen state that prevents spoilage and decay and preserves them for long periods. As a result of plaintiff's treatment of the cheese it becomes edible although unfit for human consumption when received. That the eggs undergo processing while in plaintiff's care seems specially clear.

It occurs to us there is a close analogy between applying heat to foodstuffs in order to sterilize and preserve them and subjecting food to below zero temperatures for several days for a similar purpose. Freezing appears to be as clearly processing as cooking does. All concede pasteurizing milk is processing. It consists of a brief application of heat followed by cooling for a short time and is a simpler process than plaintiff uses upon meat, butter and eggs. What was done here to these three products seems analogous to pasteurization.

As stated, the commission's rule 26 says refrigeration is not regarded as processing. And it has been held electricity

used by a retail grocer to refrigerate meat, milk and other perishable foods is not used in processing since what is done is merely to preserve them in substantially the same condition. Warren v. Fink, 146 Kan. 716, 72 P.2d 968. We find no fault with this decision and think the rule is reasonable when properly applied. But plaintiff's treatment of meat, butter, eggs and cheese, above described, cannot fairly be called refrigeration.

We can agree that a reasonable interpretation of rule 26 justifies the holding that electricity which is used in cooling butter while in storage, after it is hard frozen, is used for refrigeration and is not exempt from tax. And electricity used to cool eggs after the six-weeks period to which we have referred is also not exempt. The same is true of the current used during storage of meat after it is hard frozen for the required six to eight days. The parties have stipulated that about a third of the electricity in controversy was used for refrigeration during such storage of the products. This is not exempt.

The commission's rule 25.1 states: "Persons engaged in operating refrigeration or cold storage locker plants to store property belonging to others are rendering a service, the gross receipts from which are not subject to sales tax. Such operators of course are not exempt when purchasing electrical energy for use in creating refrigeration or other purposes in connection with such service."

It would seem this rule was intended to apply to operators of the familiar locker plants for cold storage of foods for householders and other consumers who have already paid sales tax upon the foods. Electricity used in such plants is not exempt from tax because it is not intended the foods are to be sold ultimately at retail, as section 422.42(3) provides. Such foods have already been sold at retail before they are received by the plants. As previously explained, plaintiff concedes its liability for tax upon electricity used in this part of its business.

If rule 25.1 or 26 is intended to provide that something is not processing which clearly falls within the meaning of that term the rule cannot be upheld. The legislature has created the exemption and neither the commission nor this court may nullify it. The commission has no power to prescribe rules inconsistent with statutory provisions. Section 422.61, made appli-

cable to chapter 423 by section 423.23; Bruce Motor Freight v. Lauterbach, supra, 247 Iowa 956, 961, 962, 77 N.W.2d 613, 616, 617, and citations. See also Dain Mfg. Co. v. Iowa State Tax Comm., 237 Iowa 531, 536, 22 N.W.2d 786, 789, 790.

The commission contends plaintiff is not entitled to any exemption because it does not own the meat, butter, eggs and cheese it handles. Nothing in the statutes (nor, incidentally, in any rule of the commission called to our attention) requires that a processor own the property it processes. The construction contended for would place a limitation upon the exemption the legislature did not see fit to place thereon and would in effect rewrite the statute. If the commission's position in this respect were justifiable one would expect its rule 25.1 to provide simply that those operating locker plants may not claim exemption because they do not own the foods they store.

In Piper v. Glander, 149 Ohio St. 109, 110, 77 N.E.2d 714, taxpayers sold meat to consumers which they chilled, cut up, froze and stored in individual lockers rented to their patrons. While their claim to exemption as processors was denied on the ground they did not process property *for sale,* since the sales had already been made, the court said: "That appellants do process for the owners of the food which is to be stored is clear * * *." As previously explained, it is admitted here these foods were "intended to be sold ultimately at retail."

We think the exemption we have upheld is within the spirit as well as the letter of the law. Courts have frequently pointed out that an important reason for processing exemptions is that the cost of the processing is included in the price of the product ultimately sold at retail, thus increasing the sales tax the consumer is required to pay. The purpose of this exemption may well have been to avoid double taxation and prevent an increase in the ultimate price to the consumer. After all it is he who bears the whole tax whether computed on the price he pays or included therein. Dain Mfg. Co. v. Iowa State Tax Comm., supra, 237 Iowa 531, 534, 22 N.W.2d 786, 788; Kroger Grocery & Baking Co. v. Glander, 149 Ohio St. 120, 77 N.E.2d 921, 926. See also Kress v. Department of Revenue, 322 Mich. 590, 34 N.W.2d 501, 503.

 Since we have not sustained in full plaintiff's claim to exemption there remains for disposition the commission's cross-appeal from the trial court's refusal to enter judgment for penalty on the tax "in view of the good faith manner in which the issues have been contested." The commission assessed a penalty of $115.52. There is no merit to its contention that the judgment does not overrule this penalty assessment. Such is the effect of the judgment and the commission so construed it in its notice of cross-appeal.

The commission thus states its proposition for reversal: "The district court was without jurisdiction to substitute its discretion for that of the commission in assessing a penalty." Since this is the only contention the commission makes upon its cross-appeal we consider no other.

Code section 422.58(1) provides that anyone failing to file a return or pay any sales tax within the time required "shall be subject to a penalty * * *; but the commission, if satisfied that the delay was excusable, may remit all or any part of such penalty." Section 423.18 contains a similar provision with regard to use tax.

The commission argues that penalties attach as a matter of law under these provisions and only the commission is given power to remit them. It concedes that if the court does not sustain the tax the penalty assessment would automatically be canceled because the penalty is assessable in percentages of the tax owing. It follows from this that in any event plaintiff would not be liable for a penalty on more than the tax ultimately found to be owing. The commission also concedes that if it acted arbitrarily or capriciously in failing to remit any penalty the courts would probably provide a remedy for such action. It also says it may yet remit all or part of the penalty assessed against plaintiff.

 It is true, as the commission says, the general rule is that the good faith of a taxpayer in litigating his liability for a tax is insufficient basis for relieving him from a statutory penalty that attaches for nonpayment of the tax. 51 Am. Jur., Taxation, section 975; Hamel v. Marlow, 171 Miss. 559, 157 So. 905, 96 A. L. R. 924, and annotation 925, 926.

Yet a number of courts, in the exercise of their equitable powers, have relieved taxpayers from tax penalties under meritorious conditions. United States Trust Co. v. Territory of New Mexico, 183 U. S. 535, 543, 545, 22 S. Ct. 172, 46 L. Ed. 315, 322; Dravo Contracting Co. v. James, 4 Cir., W. Va., 114 F.2d 242, 147 A. L. R. 135, 141, and annotation 142; General Petroleum Corp. v. Smith, 62 Ariz. 239, 157 P.2d 356, 158 A. L. R. 364, 369; Commonwealth of Kentucky v. Cincinnati, N. O. & T. P. Ry. Co., 288 Ky. 43, 155 S.W.2d 460, 137 A. L. R. 301, and annotation 306; 51 Am. Jur., Taxation, section 975, page 853.

The authorities on the question whether a taxpayer's good faith is sufficient basis for judicial relief from penalty hardly reach the commission's proposition the court was without jurisdiction to grant such relief here. The challenge is to the power of the court, not to the propriety of its decision.

85 C. J. S., Taxation, section 1031c, page 599, states: "Although it has been held that the courts may, in the exercise of their equitable powers, abate or remit tax penalties under meritorious conditions, the more general rule is that, in the absence of statutory authorization, the courts have no power to relieve delinquent taxpayers from penalties incurred by violations of the statutes providing therefor."

The Cedar Rapids & M. R. Co. and The I. R. L. Co. v. Carroll County, 41 Iowa 153, 191, 192, and Lamont Savings Bank v. Luther, 200 Iowa 180, 185, 204 N.W. 430, hold we have no authority to annul a statute and remit a penalty explicitly provided for. The penalty in each of these cases was a mandatory one imposed by a statute which conferred no authority upon anyone to remit it.

State v. Woodbury County, 222 Iowa 488, 492, 269 N.W. 449, involves the right to a penalty under statutes (sections 9 and 11, chapter 56, Acts of Forty-fifth General Assembly, Extra Session) very similar, as to penalty, to sections 422.58 and 423.18, heretofore referred to. While we upheld the tax in the full amount claimed we disallowed any penalty in view of the taxpayer's good faith under the circumstances. Obviously the decision presupposes the power of the court to grant relief from penalty. The only apparent way to reconcile the decision with

the two earlier ones we have cited is on the basis of the difference in the applicable statutes. Since the statutes in the Woodbury County case are similar to those here on the question of penalty and since it is the later precedent it seems to be the stronger authority.

In any event we think there is statutory authorization for the court's remission of the penalty here. Paragraph 3 of section 422.55, which the commission tells us governs appeals of this kind, states: "The court shall hear the appeal in equity and determine anew all questions submitted to it on appeal from the determination of the commission." Plaintiff's petition alleges its good faith in contesting liability for the tax and asks that it be determined no tax or penalty is due. While section 422.55 does not expressly mention the determination of the question of penalty the language is broad enough to include it.

Section 423.16 does not bear directly upon the power of the court to remit a penalty in a meritorious case but it does give some indication of the legislative intent as to the right of appeal. It provides that if a required tax return is not filed or is incorrect or insufficient and the maker fails to file a corrected return after notice from the commission, it "shall have the same power to determine the amount due, as is vested in the commission by sections 422.54, 422.55, and 422.57, subject to all of the provisions, and restrictions, and rights of appeal provided in said sections."

In view of our decision in State v. Woodbury County, supra, 222 Iowa 488, 492, 269 N.W. 449, and more particularly of sections 422.55 and 423.16, especially the former, we hold the district court was not without jurisdiction to annul the penalty.

Upon plaintiff's appeal, the judgment is affirmed in part, reversed in part and remanded for judgment in harmony with this opinion. Upon defendant's appeal the judgment (as to the penalty) is affirmed. Costs are to be taxed one third to plaintiff, two thirds to defendant.—Affirmed in part, reversed in part and remanded.

All JUSTICES concur except SMITH, J., who takes no part.