HY-VEE FOOD STORES, INC., Petitioner/Cross-Appellant,

v.

IOWA DEPARTMENT OF REVENUE, Gerald D. Bair, Director of the Iowa Department of Revenue, and the State of Iowa, Respondent/Appellant.

No. 84-1924.

Court of Appeals of Iowa.

Oct. 29, 1985.

Thomas J. Miller, Atty. Gen., and Thomas M. Donahue, Asst. Atty. Gen., for respondent/appellant.

James D. Meyer of the Meyer Law Firm, Chariton, for petitioner/cross-appellant.

Heard by OXBERGER, C.J., and SNELL and SACKETT, JJ.

SNELL, Judge.

In 1981 petitioner Hy-Vee Food Stores, Inc. sought a $166,979 refund for sales tax paid on gas and electricity used by thirty-five pieces of grocery store equipment that Hy-Vee believed fell within the statutory

exemption in 730 Iowa Admin.Code sections 17.3 and 18.29 (422, 423) for equipment used in processing. The Iowa Department of Revenue (hereinafter Department) denied Hy-Vee's claim for the refund in part because it concluded that certain equipment was not utilized in processing. Hy-Vee filed a protest. The parties stipulated that the electricity used in sixteen pieces of equipment was used in processing and thus within the scope of the exemption. The Department Hearing Officer also found that the electricity used in the meat slicer, meat cuber, meat saw, grinder, grinder-mixer, chicken cutter, bread slicer, and hand slicer was used in processing, but disallowed Hy-Vee's claim as to the remainder of the equipment. The Hearing Officer also found that a load factor of fifty percent should be used to determine the electrical consumption of the equipment used in processing.

On appeal to the Director of Revenue, the Department's original partial denial of the refund claim was sustained. However, the Director affirmed the use of the fifty percent load factor.

Hy-Vee petitioned for judicial review of the final Department decision. The district court found that, in addition to the equipment the parties stipulated to, the electricity used in the icemaker, meat slicer, meat cuber, meat saw, meat scraper, grinder, grinder mixer, shaper, chicken cutter, bread slicer, and hand slicer was used in processing. The court held that the electricity used in the wrapping system, scales, automatic bagger, grease strainer, coolers, and water heaters was not used in processing and, therefore, subject to sales tax pursuant to Iowa Code section 422.43 (1981). Furthermore, the court found that there was not substanital evidence to support the Department's fifty percent load factor determination. The court adopted Hy-Vee's calculation of load factor.

The Department has appealed the district court's finding that the electricity used in the meat slicer, meat cuber, meat saw, shaper, chicken cutter, bread slicer, and hand slicer was used in processing. The Department also appeals the court's finding that there was not substantial evidence to support the Department's fifty percent load factor determination.

Hy-Vee cross-appeals from the district court's finding that the electricity used in the wrapper system, scales, automatic bagger, grease strainer, coolers, and hot water heaters was not used in processing.

■ **Scope of Review.** We review the decision of the district court, also rendered in an appellate capacity, and determine whether the district court correctly applied the law. "In order to make that determination, this court applies the standards of section 17A.19(8) to the agency action to determine whether this court's conclusions are the same as those of the district court." *Jackson County Public Hospital v. Public Employment Relations Board,* 280 N.W.2d 426, 429–30 (Iowa 1979).

Iowa Code section 17A.19(8)(f) (1985) provides that in a contested case the court shall grant relief from an agency decision which is "unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole." Evidence is substantial when a reasonable person would accept it as adequate to reach a conclusion. *Peoples Memorial Hospital v. Iowa Civil Rights Comm.,* 322 N.W.2d 87, 91 (Iowa 1982). The question is not whether the evidence might support a different finding, but whether the evidence supports the findings actually made. *Ward v. Iowa Dept. of Transportation,* 304 N.W.2d 236, 237–38 (Iowa 1981). The fact that two inconsistent conclusions can be drawn from the evidence does not permit us to make a finding inconsistent with the agency's findings so long as there is substantial evidence to support the agency's decision. *Peoples,* 322 N.W.2d at 91.

Special additional principles apply in tax cases. "Statutes which impose taxes are construed liberally in favor of the taxpayer and strictly against the taxing body. It must appear from the language of a statute that the tax assessed against the taxpayer was clearly intended." *Iowa Auto Dealers v. Iowa Dept. of Revenue,* 301

N.W.2d 760, 762 (Iowa 1981). However, when the taxpayer relies on a statutory exemption, the exemption is construed strictly against the taxpayer and liberally in favor of the taxing body. *Id.* Doubts are resolved against exemption.

**I. Processing Exemption.** The determinative question is whether electricity purchased by Hy-Vee was used in processing tangible personal property for ultimate sale to consumers. If so, Hy-Vee is entitled to a refund for sales tax paid for electrical consumption.

Iowa Code section 422.43 (1981) imposes a sales tax upon the gross receipts from retail sales of gas and electricity:

*There is hereby imposed a tax of three percent* upon the gross receipts from all sales of tangible personal property, consisting of goods, wares, or merchandise, except as otherwise provided in this division, sold at retail in the state to consumers or users; a like rate of tax *upon the gross receipts from the sales, furnishing or service of gas, electricity, water, heat, and communication services,* including the gross receipts from such sales by any municipal corporation furnishing gas, electricity, water, heat, and communication services to the public in its proprietary capacity, *except as otherwise provided in this division, when sold at retail in the state to consumers or users;* .... (emphasis added)

Iowa Code section 422.42(3) (1981) by definition exempts gas and electricity used in the processing of tangible personal property from sales at retail:

3. *"Retail sale"* or *"sale at retail" means the sale to a consumer or to any person for any purpose, other than for processing* or for resale of tangible personal property or taxable services, or for resale of tangible personal property in connection with taxable services, *and the sale of gas, electricity, water, and communication service to retail consumers or users, but does not include* commercial fertilizer or agricultural limestone or materials, but not tools or equipment, which are to be used in disease control,

weed control, insect control or health promotion of plants or livestock produced as part of agricultural production for market, or *electricity or steam or any taxable service when purchased and used in the processing of tangible personal property intended to be sold ultimately at retail.* (emphasis added)

"Processing" is also defined in subsection 3:

Tangible personal property is sold for processing within the meaning of this subsection only when it is intended that such property shall by means of fabrication, compounding, manufacturing, or germination become an integral part of other tangible personal property intended to be sold ultimately at retail, or shall be consumed as fuel in creating heat, power, or steam for processing....

Iowa Code § 422.42(3) (1981).

The Department of Revenue has promulgated rules which further elaborate upon what comes within the scope of the processing exemption. An agency rule has the binding effect of law. *Young Plumbing Co. v. Iowa,* 276 N.W.2d 377, 382 (Iowa 1979). Therefore, these departmental rules guide our interpretation and implementation of Iowa Code section 422.

**Fuel used in processing—when exempt.** Receipts from the sale of tangible personal property which is to be consumed as fuel in creating power, heat or steam for processing, including grain drying or for generating electric current, shall be exempt from sales tax.

The exemption provided in the case of tangible property consumed as fuel in creating heat applies only when such heat is directly applied in the actual processing of tangible personal property intended to be sold ultimately at retail, as distinguished from heat which is used for the purpose of heating buildings, whether such buildings be manufacturing or processing plants, warehouses or offices. *Chicago, B. & Q.R. Co. v. Iowa State Tax Commission,* 1966, 259 Iowa 178, 142 N.W.2d 407.

Fuel used in processing is exempt to creameries, dairies or ice cream factories only to the extent that such fuel or electricity, as the case may be, is used in the actual processing of the finished product. This does not include fuel used for storage after the manufacturing process is completed.

This rule is intended to implement section 422.42(3), The Code.

730 Iowa Admin.Code § 517.2(422) (1981).

**Electricity or steam used in processing.** Receipts from the sale of electricity or steam to be used in the processing of tangible personal property intended to be sold ultimately at retail shall be exempt from sales tax.

The exemption provided in the case of electricity or steam applies only upon the gross receipts from the sale of electricity or steam when such energy shall be consumed as power or used in the actual processing of tangible personal property intended to be sold ultimately at retail, as distinguished from electricity or steam which is consumed for the purpose of lighting, ventilating or heating of manufacturing plants, warehouses or offices....

a. Electricity used in the freezing of tangible personal property, ultimately to be sold at retail, to make such property marketable would be exempt from the imposition of tax. *Fischer Artificial Ice & Cold Storage Company v. Iowa State Tax Commission*, 1957, 248 Iowa 497, 81 N.W.2d 437.

b. Electricity used merely in the refrigeration or the holding of tangible personal property for the purpose of preventing spoilage and to preserve the property in its present state would not be "used in processing" and, therefore, would be subject to the imposition of the tax. *Fischer Artificial Ice & Cold Storage Company v. Iowa State Tax Commission*, 1957, 248 Iowa 497, 81 N.W.2d 437.

730 Iowa Admin.Code § 17.3 (422, 423) (1981).

**Processing.** For the purpose of these rules, "processing" means an operation or a series of operations whereby tangible personal property is subjected to some special treatment by artificial or natural means which changes its form, context, or condition, and results in marketable tangible personal property. These operations are commonly associated with fabricating, compounding, germinating, or manufacturing. *Linwood Stone Products Co. v. State Department of Revenue*, 175 N.W.2d 393 (Ia. 1970).

This rule is intended to implement sections 422.42 and 423.1 of the Code.

730 Iowa Admin.Code § 18.29(422, 423) (1981). The Iowa Supreme Court has also stated that "[p]rocessing essentially connotes the transformation of raw material into a finished product" in marketable form. *Iowa Auto*, 301 N.W.2d at 764. Operations upon products which merely enhance their sale value and make them more attractive to consumers are not processing. *Id.*

■ The purpose of the processing exemption was enunciated by the Iowa Supreme Court in *Fischer*. "Courts have frequently pointed out that an important reason for processing exemptions is that the cost of processing is included in the price of the product ultimately sold at retail, thus increasing the sales tax the consumer is required to pay. The purpose of this exemption may well have been to avoid double taxation and prevent an increase in the ultimate price to the consumer. After all it is he who bears the whole tax whether computed on the price he pays or included therein." *Fischer*, 248 Iowa at 505, 81 N.W.2d at 442.

As evidenced by the Department's rules, Iowa case law has applied the definition of processing in varying contexts and either accepted or rejected specific activities as processing. In Iowa, processing includes manufacturing ice, refrigerating cheese to age it from "green" to edible, refrigerating eggs to change their flavor, pasteurizing and subsequent refrigeration of milk, hard

freezing of meat and butter for appropriate aging, canning vegetables, and cooking foodstuffs. *Fischer*, 248 Iowa at 500–05, 81 N.W.2d at 439–41. Processing also includes the crushing of flat rock limestones, conveying it to screens where it is graded for size, and treating it in kilns. *Linwood*, 175 N.W.2d at 394. However, it is not processing when used cars are repaired, *Iowa Auto*, 301 N.W.2d at 764; when records are placed in a juke box, *Ramco, Inc. v. Director, Dept. of Revenue*, 248 N.W.2d 122, 123 (Iowa 1976); or when a retail grocer refrigerates perishable foods merely to preserve them in substantially the same condition, *Fischer*, 248 Iowa at 504, 81 N.W.2d at 441.

We consider Hy-Vee's slicing and cutting equipment in one group. The character of individual pieces of equipment is not in dispute. Each slicer or cutter operates upon a larger chunk of either meat, poultry, cheese, or bread and reduces it to various sizes or cuts for consumer purchase. What is in dispute, however, is whether these pieces of equipment are used in processing Hy-Vee's grocery products for retail sale.

The Department argues that because Hy-Vee's meat, poultry, cheese, and bread are technically saleable in uncut or unsliced portions that cutting and slicing of these products does not transform raw material into anything different. Cutting and slicing only makes the products more attractive to purchasers.

The Iowa Supreme Court's analysis in *Linwood* dismisses the Department's argument. There, an analogous situation involving a limestone quarry was presented. In the quarry operations, limestone was severed from its bed into large pieces of solid flat rock. The rock was then transported to crushers where it was further broken up and graded. The court recognized that *all* of the products, from the flat rock obtained right after the blasting to calcium sulphate at the end of the operation, are reasonable classified as marketable personal property. *Linwood*, 175 N.W.2d at 394.

*Linwood* emphasizes the fact that tangible personal property may be marketable in a variety of forms; however, the concern for purposes of the processing exemption is what operations can be characterized as changing the structure of the property.

There is no question that Hy-Vee occasionally sells some of its cheese in large pieces, meat in halves and quarters, chickens whole, and bread in whole loaves. While these products are not strictly unsaleable, grocery stores do not sell the majority of their meat, poultry, and cheese and bread in this fashion. When Hy-Vee receives products from its suppliers, it does not receive "finished products" for purposes of retail sale in a grocery store. The halves of meat, whole chickens, and large pieces of cheese must be changed in form in order to become what consumers purchase. By cutting and slicing these products, Hy-Vee is not merely enhancing their value, but rather completing the process of making them marketable to the modern grocery shopper.

We conclude that the meat slicer, meat cutter, meat saw, chicken cutter, hand slicer, and bread slicer are all used in the processing of tangible personal property. Therefore, the electricity consumed by this equipment was used in processing and exempt from sales tax.

■ Hy-Vee contends that its cooler system supports a processing exemption because it is necessary for sanitation. Coolers are used in the meat department to provide low-temperature working space for cutting chickens into parts, to prevent growth of bacteria, to keep meat from bleeding, and to prevent insect and rodent infestation.

A line was drawn in the context of refrigeration by Iowa case law which is now set forth in a Department rule. Electricity used for refrigeration of food products to preserve them in substantially the same condition and prevent spoilage is not exempt from sales tax, while electricity used for cold storage aging of meat, butter, eggs, and cheese is exempt from sales tax.

*Fischer,* 248 Iowa at 503–04, 81 N.W.2d at 441; 730 Iowa Admin.Code § 17.2(422) (1981).

Accordingly, Hy-Vee's cooler system is not used in processing because it primarily preserves foodstuffs in their present state and prevents contamination and spoilage. Therefore, Hy-Vee is not entitled to a refund for sales tax paid on electricity consumption by its cooler system.

■ Hy-Vee next contends that its scales, wrapping system, free-standing wrappers, and automatic bagger are used in processing. Various scales are used by Hy-Vee to weigh and compute the price of products. The wrapping system is made up of several pieces of equipment which coordinate to wrap and seal trayed meat. The free-standing wrappers package produce and other foodstuffs. The automatic bagger bags fruits and vegetables. Hy-Vee argues that because there is no market for unweighed and unpackaged products, the scales, wrappers, and bagger are used in processing raw material into finished products.

The definition of processing differs slightly in section 422.42(3), regarding the sales tax exemption, and section 423.1, regarding the use tax exemption. Section 423.1 expressly includes "containers" as property used in processing.

> Property used in "processing" within the meaning of this subsection shall mean and include (a) any tangible personal property including containers which it is intended shall, by means of fabrication, compounding, manufacturing or germination, become an integral part of other tangible personal property intended to be sold ultimately at retail. . . .

Iowa, along with several other jurisdictions, has applied this definition of processing and determined that equipment which packages products is used in "processing." *Zoller Brewing Co. v. State Tax Comm.,* 232 Iowa 1104, 5 N.W.2d 643 (1942) (equipment used in packaging beer included within processing exemption from use tax); *Kroger Grocery & Baking Co. v. Glander,* 149 Ohio St. 120, 36 Ohio Ops. 171, 77 N.E.2d 921 (1948) (wrapping and packaging part of "processing" where statute expressly exempted such materials from tax); *cf. Carpenter v. Carman Distributing Co.,* 111 Colo. 566, 144 P.2d 770 (1943) (wrapping and bags not used in processing for dry cleaners because no products offered for retail sale).

However, this language is not found in sections 422.42(3)'s definition of processing. Because the Iowa legislature specifically includes packaging within the meaning of processing when it intends to do so, we cannot read it into section 422.42(3).

There is no question that the operation of Hy-Vee's scales, wrappers and bagger is essential to its business. However, the fact that Hy-Vee must weigh and wrap its products prior to sale does not make the operation of this equipment "processing" within the meaning of section 422. This equipment does not change the form, context, or condition of the products. Nor does weighing and packaging fabricate, compound, manufacture, or germinate products. The product remains the same product after it is weighed and packaged.

Therefore, we conclude that the scales, wrapping system, free-standing wrappers, and automatic bagger are not used in processing tangible personal property. The electricity used in operating this equipment is not exempt from sales tax.

■ Hy-Vee also argues that its hot water heaters and grease strainers are used in processing because cleanliness of personnel and equipment is essential to processing grocery products. The hot water heaters provide hot water for cleaning all of Hy-Vee's equipment, produce, and preparation areas and supply water for bakery and delicatessen recipes. The grease strainers filter grease for reuse in the chicken fryer and are instrumental in the maintenance of the fryer.

These pieces of equipment do not change the form, context or condition of any products. Neither do they fabricate, compound, manufacture, or germinate products. We conclude that the hot water heaters and

grease strainers are not used in processing tangible personal property. Therefore, the electricity used in operating this equipment is not exempt from sales tax.

■ **II. Load Factor.** The Department found that a fifty percent load factor should be used to determine the electrical consumption of Hy-Vee's processing equipment. A "load factor" is used to estimate the amount of electricity actually consumed by individual pieces of equipment. The maximum amount of electricity used by a machine is determined by multiplying a machine's voltage requirements by hours of usage. However, it is often necessary to discount this sum because the machine consumes a varying amount of electricity depending on its operation. The example given by the Department is apposite: A saw draws a higher amount of electricity when cutting meat and consumes less electricity when it is idling and not under load. Likewise, an oven uses more electricity to bring it up to operating temperature than it consumes when it cycles on and off to retain that temperature constantly.

The Department chose a fifty percent load factor based on the testimony of Revenue Examiner Dale Thede. He testified as follows:

Q. What is your occupation? A. Revenue examiner for Excise Tax Division, Iowa Department of Revenue.

Q. What is your educational background? A. I have a BA from the University of Northern Iowa.

Q. You have worked how long for the Department? A. Approximately nine years.

Q. What is your involvement on this Hy-Vee refund claim? A. I'm the person responsible in the Excise Tax Division for the refund claims for sales and use tax. So when the original claim was filed, it was filed with me, and then any further proceedings that go on through it to the denial of the claim are handled by—or coordinated through me.

Q. What—I'll hand you a paper and I'd like to have you identify that. A. We have a claim for refund investigation made on the Hy-Vee Food Stores, 1527 Albia Road, Ottumwa which prepared— was prepared by one of our field auditors.

Q. Is this basically a summary of what happened when you investigated this refund claim? A. Right. We— there being so many stores involved, I believe some 90 stores or 93 stores involved in the claim, didn't have the manpower to look at all the claims, so we sent out an investigation to just a few random selected stores. This is the report back by the auditor from this store in Ottumwa after the information they found in regard to the respective schedules that are found in the four books of evidence that were presented before as to reviewing the various items for the type of machinery, the watts, horsepower, et cetera, that we involved or the hours of usage, everything that was listed in those schedules to determine if they were—whether they were correct.

Q. Were there any variances found in the Ottumwa store? A. I believe this report states that there is very few variances found in the schedules.

\* \* \* \* \* \*

Q. I would have you identify the next paper I hand you. [Exhibit B] A. Here we have another assignment forwarded back by our auditor in the field, a Neil Langenwalter of Area 5, in regards to the Hy-Vee Food Store Number Three at 2325 Crossroads Boulevard, Waterloo, Iowa. Again, discussing the same things that were referred to in the last piece, assignment that was provided discussing the various kilowatt rating and things that were found in those four books, and giving a description of the types of equipment as they are used in the store—the stores.

\* \* \* \* \* \*

Q. I would like to have you look at what's been marked Exhibit C? A. Exhibit C is another communication from our field office from a Robert Hageman, Auditor Three of Area 6, in regards to

the Hy-Vee Store at 3333 Asbury Road in Dubuque, Iowa. Again references the same things were found in Exhibit A and B.

\*    \*    \*    \*    \*    \*

A. Exhibit D is another report from our field office involving the Hy-Vee Food Store, 1700 35th Street in West Des Moines, Iowa, explaining the same things as found in A, B and Exhibit C. This one goes into more further detail than some of the others do as to the listing of equipment and into further detail as it's noted in Item Number 6E, and Item Number 9 as to the load factors that were mentioned earlier as to which ones were involved, would be considered not operating at the full amount as listed.

\*    \*    \*    \*    \*    \*

Q. *Would you explain the discussion about load factors you were talking about?* (emphasis supplied)

\*    \*    \*    \*    \*    \*

*As stated in it [Exhibit D], I think it just stated here in the auditor's report that their equipment involved, it states, is thermostatically controlled; and the auditor contacted the manufacturers involved and the utility company for information to estimate how these were operated. They said they could be operated anywhere from 20 to 80 percent of the maximum load as it states.* (emphasis supplied)

(BY MR. DONAHUE) Q. What did the Department chose to use? A. *The Department, chose to use, since it's an arbitrary figure, between 20 and 80 percent, you know, that it could vary on any one.* The Department has used a figure of, you know, presented a figure—I should say presented *a figure of 50 percent being—splitting the difference.* (emphasis supplied)

Q. How did that compare with the figures Hy-Vee uses in their Exhibits 52 through 55? A. Well, that would be extremely hard to tell because theirs is based on power usage and the kilowatt rating as it's shown on the rating. So I'd

be unable to tell how they took that into consideration.

Q. *Did you ever ask Hy-Vee for the actual utility bills for the Hy-Vee Stores?* (emphasis supplied)

\*    \*    \*    \*    \*    \*

THE WITNESS: Yes, I asked.

Q. *Were they given to you by Hy-Vee?* A. *No. They were not provided.* (emphasis supplied)

Q. Did Hy-Vee give you any reason why they didn't want to give them to you? A. *We received a letter from Mr. Kurt Jonsson with regards to the procedures that he had used in computing the refund, and that there would be supposedly the same math calculation would be involved without having the correct actual utility bills.* (emphasis supplied)

\*    \*    \*    \*    \*    \*

Hy-Vee offered a report costing $30,000 by Energy and Value Consultants, Inc. endeavoring to show that the "load factor" used by the Department was in error. That report was based on "operating hours" obtained from Hy-Vee's employees at various stores, an estimate of the actual energy used by the machines, and then discounted by an estimated factor to compensate for error and load conditions. The estimated factor was based on its prior experience in other states with similar grocery store operations. A weakness in this report occurs, however, because it relies on estimates by employees and estimated discount sales. The agency properly concluded that this report failed to prove the Department's calculation of "load factor" to be in error.

██  The agency's findings are conclusive when facts are in dispute or inconsistent conclusions may be drawn from the evidence. Given the fact that "load factor" is at best an estimation, Dale Thede's testimony along with the Department's auditing reports constitute substantial evidence supporting the agency's finding of a fifty percent load factor.

AFFIRMED IN PART; REVERSED IN PART.