NORTH STAR STEEL CO., Appellee,

v.

IOWA DEPARTMENT OF
REVENUE, Appellant.

No. 84–1870.

Supreme Court of Iowa.

Jan. 15, 1986.

Thomas J. Miller, Atty. Gen., Harry M. Griger, Sp. Asst. Atty. Gen., and Thomas M. Donahue, Asst. Atty. Gen., for appellant.

F. Richard Lyford and Barbara G. Barrett, of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McCORMICK, SCHULTZ, and WOLLE, JJ.

WOLLE, Justice.

The Iowa Department of Revenue (department) contends that North Star Steel Company (North Star) must pay Iowa use tax on the refractory materials and carbon electrodes which it purchased for use in the production of steel in its electric arc furnace during the assessment period of October 1, 1977, through September 30, 1978. The final agency decision of the depart-

ment upheld assessment of the use tax on the furnace materials. The district court on judicial review of that agency decision determined that the refractory materials but not the electrodes were subject to the use tax, and both parties have appealed. We conclude that the department applied an incorrect legal standard, a "primary use" test, in deciding that the materials were subject to use tax. North Star established as a matter of law that both the refractory materials and carbon electrodes were exempt from the use tax because they were used in "processing" as that term is defined in Iowa Code section 423.1(1)(a) (1977). (All statutory references herein are to the 1977 Code of Iowa, unless otherwise indicated.) Consequently, we affirm on the department's appeal and reverse on North Star's cross appeal.

North Star owns and operates a steel mill in Wilton, Iowa. In the operation of the mill North Star produces and sells steel, slag, and bag dust. The issues on appeal concern the taxable status of refractory materials and carbon electrodes—property used in North Star's electric arc furnace.

The components of the electric arc furnace used by North Star in its production of steel can be described with the help of the following rough sketch.

ELECTRIC-ARC FURNACE

The furnace has the shape of a large covered bowl. The manufacturing process consists of three stages—a "melting period", a "refining period", and a "repair period".

At the beginning of the melting cycle the bottom of the furnace is filled with various raw materials, collectively referred to as the "charge." Graphite rods, referred to as carbon electrodes, are then lowered into the furnace and positioned approximately one-half inch above the charge. A high-voltage current is sent through the rods, resulting in an electric arc which passes through the air between the electrodes. The electric arc generates intense heat which reduces the charge to a molten mass, referred to as the "bath." During the melting period the carbon reacts with oxygen and hydrogen to drive impurities from the steel. The melting cycle lasts from sixty to ninety minutes.

At the beginning of the refining cycle a small sample of the molten metal is analyzed to determine the presence or absence of various substances within the steel. Depending upon the result of the chemical analysis and the intended use of the finished product, some materials may be added to or taken from the bath. Carbon is a crucial element of finished steel. On occasion, the graphite electrodes are dipped into the molten mass to increase its carbon content. The dipping procedure can also be used to cause a chemical reaction which purges the steel of certain impurities such

as sulphur, phosphorous, or magnesium. During the refining period the electrodes are not used to conduct electricity; the electric current is turned off once the raw materials become a molten mass. The refining cycle lasts between thirty and forty-five minutes.

When all impurities have been removed from the steel and any necessary materials added, the repair cycle begins. This stage is necessary to replace the refractory material that has been worn away in the steelmaking process.

Refractory material is used in the lining and construction of the furnace. It comes in a variety of forms including brick, plaster, and spray. The refractory material protects the furnace and associated vulnerable steel-making equipment from the intense heat generated during the steel-making process. Because it is in direct contact with the molten "bath" the refractory material is attacked and slowly consumed, with much of the material transformed into slag and bag dust which North Star sells as by-products of the steel-making process. Consumption of the refractory materials makes necessary a repair cycle which lasts from fifteen to twenty-five minutes. Even refractory material that does not come into direct contact with the molten material deteriorates during the manufacturing process and must be replaced periodically. Approximately every thirty days, the furnace is shut down to completely reline its side walls with new refractory material.

On May 5, 1980, the department assessed North Star a use tax on North Star's purchase and use of electrodes and refractory materials during the period from October 1977 through September 1978. North Star filed a consumer use tax protest in which it denied liability for use tax on these purchased products. North Star argued that the electrodes and refractory materials were not taxable because its use of those products constituted "processing," a use excepted from use tax by specific statutory language.

A contested case hearing was held and on May 28, 1981, the hearing officer entered an order finding the refractory materials taxable and the electrodes nontaxable. The director of the department of revenue, however, applied a "primary use" test to North Star's use of these materials which serve several functions and held that North Star's use of both products was taxable. On review the board of tax review in the final agency decision adopted without change the director's order taxing North Star's use of both products.

North Star sought judicial review of that decision, and on October 26, 1984, the district court held that the refractory materials were taxable but the electrodes were nontaxable. Both parties have appealed, the department contending that both the refractory materials and electrodes are taxable and North Star contending that both are exempt from use tax.

We first summarize the general legal principles governing this judicial review proceeding. We then analyze the statutory language and Iowa case law to decide whether the department erred in applying a "primary use" test in determining that North Star's use of the materials was not within the "processing" exemption. Finally, we apply the statute to the facts established by the final agency decision to decide whether North Star met its burden to establish the claimed exemption as a matter of law.

### I. Scope of Judicial Review.

■ This proceeding is governed by Iowa Code section 17A.19, the judicial review provision within the Iowa Administrative Procedure Act. Our function on appeal, like that of the district court, is to correct any errors of law in the final agency decision. *Kartridg Pak Co. v. Department of Revenue*, 362 N.W.2d 557, 559 (Iowa 1985). The principal question of law we must answer is whether the agency correctly interpreted Iowa Code section 423.1(1)(a). In reviewing the administrative agency's interpretation of that statute we give weight to the agency's determination but are not bound by its interpretation. *Ballstadt v. Iowa Department of Revenue*,

368 N.W.2d 147, 148 (Iowa 1985); *American Home Products Corp. v. Iowa State Board of Tax Review*, 302 N.W.2d 140, 142 (Iowa 1981). The meaning of a statute is always an issue of law for the court to decide. *Schmitt v. Iowa Department of Social Services*, 263 N.W.2d 739, 745 (Iowa 1978).

## II. *The "Processing" Exemption.*

Iowa's use tax, set forth in Iowa Code chapter 423, is an excise tax designed to supplement and protect sales tax. *Northern Natural Gas Co. v. Lauterbach*, 251 Iowa 885, 887, 100 N.W.2d 908, 909 (1960). Tangible personal property purchased for use in Iowa is taxed by section 423.2 when it comes within the statutory definition of "use" found in section 423.1(1), but that subsection excepts property used in "processing." The pertinent statutory language of section 423.1(1) is as follows:

> *"Use"* means and includes the exercise by any person of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include processing, or the sale of that property in the regular course of business. Property used in "processing" within the meaning of this subsection shall mean and include (a) any tangible personal property including containers which it is intended shall, by means of fabrication, compounding, manufacturing, or germination, become an integral part of other tangible personal property intended to be sold ultimately at retail, ... (c) chemicals, solvents, sorbents, or reagents, which are directly used and are consumed, dissipated, or depleted in processing personal property, which is intended to be sold ultimately at retail, and which may not become a component or integral part of the finished product.

North Star contends that its use of the refractory materials and carbon electrodes comes within subparagraphs (a), a manufacturing process exception, and (c), a chemical process exception. Our focus is on the subsection (a) exception because we conclude that it fits North Star's use of both the carbon electrodes and refractory materials.

■ A. *Burden of proof.* The parties disagree on whether North Star or the department had the burden of proof on factual questions involving the processing exemption. Our cases clearly place the burden of proof on North Star. Although statutes which impose taxes are construed liberally in favor of the taxpayer and strictly against the taxing body, statutory exemptions are construed strictly against the taxpayer, and the taxpayer has the burden to establish a right to come within an exemption. *Iowa Auto Dealers Association v. Iowa Department of Revenue*, 301 N.W.2d 760, 762 (Iowa 1981). The statutory language excepting "processing" from the Iowa use tax creates an exemption from tax, so North Star had the burden to show that its use of the refractory materials and electrodes was exempt. *See id.* at 763–64; *Peoples Gas & Electric Co. v. State Tax Commission*, 238 Iowa 1369, 1375, 28 N.W.2d 799, 804 (1947).

B. *The department's primary use test.* Central to this case is the department's application of a "primary use" test which it claims to derive from this statute and our cases construing tax statutes. The department argues that when, as here, some uses of property would be taxable and some nontaxable, it may assess use tax if the primary use of the property is taxable. The department's final agency decision clearly discloses its reliance on that test:

> [I]n a situation where there is more than one distinct and independent use for some item, one of which is a taxable use and one of which is tax exempt, then the primary use or primary purpose test must be applied. To hold otherwise would be to allow certain items to escape taxation simply because they are involved in two or more distinct uses, some of which are taxable and some of which are tax exempt. Such is clearly not the intent of the statute.

The department contends that several Iowa decisions "require" that this primary use test be applied. It also argues that it has

used this test for many years and has promulgated regulations which adopt a primary use test for application of the chemical process exemption found in section 423.-1(1)(c).

We have carefully studied the authorities on which the department relies, but we find they do not support use of such a test. No Iowa decision construing use tax statutes even mentions a "primary use" or "primary purpose" test.

In *Dain Manufacturing Co. v. Iowa State Tax Commission*, 237 Iowa 531, 22 N.W.2d 786 (1946), we were called upon to construe a processing exemption in the use tax statute then in effect (and since modified) which exempted "industrial materials and equipment ... which are directly used in the actual fabricating, compounding, manufacturing, or servicing of tangible personal property intended to be sold ultimately at retail." *Id.* at 533, 22 N.W.2d at 788. The parties in that case agreed that one item in question was "generally" but not "entirely" used for an exempt purpose, and we held:

> The article is conceded to have been "generally" used in producing or preparing property intended for retail sale. That seems sufficient under the statute. An article may be *directly*, without being *entirely*, used for a given purpose.

*Id.* at 538, 22 N.W.2d at 790 (emphasis in original). In the same case we held that a second item was not within that "processing" definition because it did not take any part in the actual processing of goods for retail.

In *City of Ames v. State Tax Commission*, 246 Iowa 1016, 71 N.W.2d 15 (1955), we refined the application of the statutory "processing" provision which had previously been addressed in *Dain*. We explained that switchgear equipment of the city served several important functions, some taxable and some nontaxable. We held:

> If any substantial part of the function of the switchgear is either manufacturing or servicing electricity, the use tax does not apply.

*Id.* at 1031, 71 N.W.2d at 24. That application of the processing exemption in a multiple-use situation stopped far short of mandating, approving, or even suggesting a "primary use" or "primary purpose" test.

In the subsequent case of *Bruce Motor Freight, Inc. v. Lauterbach*, 247 Iowa 956, 77 N.W.2d 613 (1966), another case relied upon by the department, the question was whether a company operating trucks both in interstate and intrastate transportation of goods was exempt from use tax when the statute exempted only interstate use. We repeated and relied on the above-quoted language from *Dain* and *City of Ames* in concluding that the processing exemption applied even though no one use was exclusive. Our court there quoted from and relied on a Michigan case, *Michigan Allied Dairy Association v. Auditor General*, 302 Mich. 643, 649–51, 5 N.W.2d 516, 518–19 (1942), which held that milk containers were exempt from use tax even though they served dual purposes, an exempt "agricultural producing and industrial processing" use to cool the milk and a non-exempt use as containers of the milk. The Michigan court explained that the legislature had not provided for taxation of that portion of the containers' value which represented their non-exempt use, and the scope of the use tax statute would not be extended "by implication or a forced construction." 302 Mich. at 650, 5 N.W.2d at 518. We not only quoted with approval from that Michigan case but also explained that its language was significant both on the nature of exempt uses and on the question of legislative intent. 247 Iowa at 964, 77 N.W.2d at 618.

■ Far from requiring or suggesting that a "primary use" test would be appropriate, as the department contends, these Iowa cases confirm that purchased property is exempt from use tax if it generally is used for an exempt purpose or if any substantial part of the function of the property is encompassed within a specific statutory exemption.

The department also argues that *Iowa Movers & Warehousemen's Association v.*

*Briggs,* 237 N.W.2d 759 (Iowa), *cert. denied,* 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976), supports its use of a primary purpose test. We disagree. In that case our court construed the Iowa sales tax on gross receipts from enumerated services. The service there in question was the packing of goods in containers by warehousemen, with storage of goods taxable but moving of goods exempt. Although we there held that packing was a service that might be taxed if the "predominant" service was storage, we did not adopt or mention a "primary use" test. The packing service that was there deemed taxable would not in itself have been the primary service in any event; the packing service was deemed taxable only to the extent that it was encompassed within a taxable storage service being performed by the taxpayer. *Briggs,* a sales tax case, does not authorize the department to graft onto the use tax statute a "primary use" or "primary purpose" test.

■ The department also contends that we should recognize the "primary use" test as sound statutory interpretation by the agency, arguing that the test has been used for many years and the legislature has not intervened to change the wording of the statute. Although we give weight to agency interpretations of statutes, agencies may not make law or change the meaning of statutes by interpretation alone. *Iowa Southern Utilities Co. v. Iowa State Commerce Commission,* 372 N.W.2d 274, 277 (Iowa 1985); *Iowa Auto Dealers Association v. Iowa Department of Revenue,* 301 N.W.2d at 762; *West Des Moines Education Association v. PERB,* 266 N.W.2d 118, 125 (Iowa 1978).

We note in passing that the department has promulgated regulations applying a primary use test to the chemical process exception set forth in Iowa Code section 423.1(1)(c). *See* 730 Iowa Admin. Code § 17.14. No such regulations, however, have been promulgated to support application of a primary use test in connection with subsection 423.1(1)(a).

The department erred in applying a primary use test and determining that the furnace materials were subject to use tax because they did not satisfy that test.

### III. *Was North Star's Use of the Furnace Materials Exempt?*

In deciding whether North Star established as a matter of law that its use of the materials was tax exempt, we accept the facts set forth in the final agency decision. It is clear from that decision that the carbon electrodes and refractory materials served several purposes during operation of the furnaces.

A. *The carbon electrodes.* North Star clearly intended that the electrodes be used and used up in its manufacture of steel and the byproducts of slag and bag dust. Those final products were all intended for sale at retail. The district court accurately summarized the facts found by the agency:

> The carbon rods perform four separate functions: (1) conduct electricity but only during the cycle melt; (2) react with oxygen and hydrogen to purge the steel of these impurities during both the melt and refine cycles; (3) create a boil to purge the steel of phosphorous, sulphur, or magnesium during the refining period; and (4) add carbon to the steel in about 10 to 15 percent of the refining cycles.
>
> . . . .
>
> The court finds that each of the uses made of the rods is essential or at least necessary in order to manufacture the three products. [North Star] has shown that no one use—when the steel-making process is viewed as a whole—really predominates over the others. Each use is necessary and substantial. During the heat cycle the primary use of the rods is to conduct electricity; however, during such cycle the rods also are depleted or consumed in maintaining an oxygen-free atmosphere which is essential to steelmaking. During the refining cycle the rods are solely used for purposes of processing and no electricity is conducted. This cycle also is essential to steelmaking. Even during the heat cycle when

the primary use is to conduct electricity, the rods are consumed to some extent.

■ We agree with the district court's conclusion that the carbon electrodes were "so rapidly, necessarily and directly consumed in the manufacturing process" that the use of these materials was not intended by the legislature to be taxed. North Star has established as a matter of law that its use of the carbon electrodes was exempt.

■ B. *The refractory materials.* Unlike the district court, we find no meaningful distinction between North Star's use of the electrodes and its use of the refractory materials. In finding the refractory materials taxable, the district court explained:

> The fact that the refractories do enter into the slag product is incidental to their fundamental and basic use of providing insulation for the furnace wall. Their function is intrinsically to serve as a part of the furnace wall and the other result of their use is only incidental and collateral to that function.

Both the district court and the department, however, acknowledged that the refractory materials serve a function other than as insulation and are consumed eventually by the manufacturing process. The undisputed record and agency findings of fact establish that the refractory materials are used up during the manufacturing process and do become an integral part of the slag which is sold at retail. North Star's use of these materials, like its use of the carbon electrodes, tracks the language of the statute's manufacturing-process exemption: the materials are "tangible personal property ... which it is intended shall, by means of ... manufacturing ..., become an integral part of other tangible personal property intended to be sold ultimately at retail." Iowa Code § 423.1(1)(a). There is no evidentiary support whatsoever for the further determination by the agency that North Star did not "intend" the refractory material to enter the slag and bag dust, retail products. North Star's use of this material was certainly an intended use for a desired result. The process is efficient in the sense that it allows both the carbon

electrodes and the refractories to be used up at the same time they are serving as part of the furnace and performing useful service in converting raw materials, including these materials, into steel and its byproducts. North Star established that its use of the refractory materials falls within what the legislature intended to exempt from use tax by the subsection here applied, Iowa Code section 423.1(1)(a).

Our court has discussed processing exemptions in several cases involving strikingly different types of property. Each case necessarily turns on the uses of the particular property involved. We have used ordinary dictionary definitions of processing, explaining in general terms that processing "refers to an operation whereby raw material is subjected to some special treatment by artificial or natural means which changes its form, context, or condition, and results in marketable tangible personal property." *Linwood Stone Products Co. v. State Department of Revenue,* 175 N.W.2d 393, 395 (Iowa 1970) (real property does not qualify for exempt status); *see Fischer Artificial Ice & Cold Storage Co. v. Iowa State Tax Commission,* 248 Iowa 497, 501–02, 81 N.W.2d 437, 440 (1957) (use of electricity to "sharp freeze" meat and other food falls within the processing exemption). North Star's furnace materials here in question satisfy that definition of processing.

Cases from other jurisdictions with statutes similar to ours tend to support our conclusion that North Star's carbon electrodes and refractory materials are not subject to use tax. *See, e.g., Nucor Steel v. Herrington,* 212 Neb. 310, 315, 322 N.W.2d 647, 649 (1982) (steelmaker's use of electrodes serves two purposes or functions, "both of which were significant and not merely incidental"); *Lone Star Industries, Inc. v. The Department of Revenue,* 97 Wash.2d 630, 635–36, 647 P.2d 1013, 1016 (1982) (iron grinding balls used for several purposes were exempt even though providing a small percentage of ingredients in production of cement).

We hold that the processing exemption as defined in section 423.1(1)(a) covered North Star's use of carbon electrodes and refractory materials in its steel-making furnaces. Because North Star established that its use of those materials was exempt from use tax, we need not address its alternative contention based on the doctrine of issue preclusion and a final agency decision issued in 1979 which held exempt its use of similar materials in an earlier assessment period.

We affirm that part of the district court's decision which found that North Star's use of carbon electrodes was exempt from use tax. We reverse that part of the district court's decision which upheld the assessment of use tax on refractory materials; North Star's use of those materials was also exempt from tax.

AFFIRMED ON THE DEPARTMENT'S APPEAL; REVERSED ON THE CROSS–APPEAL.